Frank S. Hedin (SBN 291289)
**HEDIN LLP**
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone: (305) 357-2107
Email: fhedin@hedinllp.com

*Attorney for Plaintiff Richard Medina and the Putative Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

RICHARD MEDINA, *individually and on behalf of all others similarly situated*,

Plaintiff,

v.

COSTAR REALTY INFORMATION, INC.,

Defendant.

Civil Action No. 5:26-cv-5548

**COMPLAINT**

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

On behalf of himself and all others similarly situated, Plaintiff Richard Medina complains and alleges as follows based on personal knowledge as to himself, the investigation of his counsel, and information and belief as to all other matters, and demands trial by jury. Plaintiff believes that substantial evidentiary support will exist for the allegations in this complaint, after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1. This case is about upholding the rights of hundreds of thousands of Americans who have never interacted with Defendant CoStar Realty Information, Inc. but who have nonetheless had their names, identities, and other personally identifying information misappropriated and used by Defendant to advertise and promote its own products and services.

2. Defendant has built a lucrative business by misappropriating the names and identities of real estate agents across the United States. Defendant has created, published, and disseminated hundreds of thousands of profile pages, each one of which centers around the personal identity of one real estate agent. On each profile page, Defendant uses the name, identity, and personally identifying information of that one real estate agent to advertise its own products and services.

3. To maximize the revenue it generates from its products and services, Defendant misappropriates the name and identity of nearly every real estate agent

whose personal information it has amassed in its database to advertise its own products and services—often without asking, let alone obtaining consent from, any of those individuals.

4. The California Right of Publicity Law ("CRPL") and California common law right of publicity clearly prohibit what Defendant has done.

5. As alleged herein, Defendant has systematically and knowingly used Plaintiff Medina's and hundreds of thousands of other California residents' names and identities for the purpose of advertising its products and services without those individuals' prior consent.

6. Accordingly, Plaintiff Medina brings this action, individually and on behalf of the proposed Class defined below, to redress and put a stop to Defendant's violations of the right of publicity.

**PARTIES**

7. Defendant CoStar Realty Information, Inc. ("Defendant" or "CoStar") is a Delaware corporation that maintains its headquarters in Arlington, Virginia. Defendant owns and operates the website Homes.com (the "Website"), where it advertises and sells products and services to persons throughout the United States, including in the state of California. Defendant is registered to do business in the state of California and may be served through its registered agent, 1505 Corporation at 2710 Gateway Oaks Drive, Sacramento, CA.

8. Plaintiff Richard Medina is a natural person and is a resident and citizen of La Quinta, California.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because (i) at least one member of the putative class is a citizen of a state different from the Defendant, (ii) the amount in controversy exceeds $5,000,000 with respect to the putative class, exclusive of interest and costs, and (iii) there are at least 100 members of the putative class.

10. Personal jurisdiction and venue are proper because Plaintiff is a resident of La Quinta, California, which is within this judicial District.

11. Personal jurisdiction and venue are further proper because Plaintiff has suffered injuries from Defendant's conduct as described herein within this judicial district.

12. Personal jurisdiction is further proper because Defendant intentionally misappropriates the names identities of California residents, targets its advertising on the Website (which misappropriates those names and identities) towards California residents, and sells products and services to California residents.

13. Personal jurisdiction is further proper because Defendant maintains offices and dozens of employees in California, including within this judicial District.

14. Defendant knowingly and intentionally misappropriates the names and identities of Plaintiff and the Class members, knows that Plaintiff and many of the Class members reside in California, and knows that the resulting harm will be suffered by Plaintiff and those Class members in California. Defendant further expressly aims its conduct at California by hosting listings for properties which are for sale in California on its Website and by connecting potential home buyers who are located in California to real estate agents who are located in California, for the purpose of facilitating transactions of properties located in California.

## APPLICABLE STATUTORY AND COMMON LAW

### I. California Right of Publicity Law

15. Recognizing the need to protect its citizens' rights of publicity, the California legislature enacted the CRPL to establish a right to control the use of one's name and likeness, among other identifying attributes, in commercial advertising.

16. The CRPL prohibits companies like Defendant from, *inter alia*, using an individual's name or likeness, in any manner, to advertise or sell, or solicit purchases of, products or services. Specifically, Section (a) of the CRPL states, in pertinent part:

> Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such

> person's prior consent, or, in the case of a minor, the prior consent of his parent or legal guardian, shall be liable for any damages sustained by the person or persons injured as a result thereof.

Cal. Civ. Code § 3344(a).

17. The CRPL provides for, *inter alia*, statutory damages of $750.00 per violation, as well as recovery of any profits attributable to the unauthorized use of the person's name or likeness. *See id.* § 3344(a).

18. As explained below, Defendant disregarded its legal responsibilities to Plaintiff Medina and hundreds of thousands of other individuals by using their names to advertise and promote its services—in direct violation of the CRPL.

## II. California's Common Law Right of Publicity

19. California also protects the right of publicity through a common law cause of action.

20. Under California's common law, a claim for violation of publicity rights has four elements: (1) the defendant's use of plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.

21. California's common law right of publicity protects not only against the unauthorized commercial use of an individual's name, voice, signature, photograph, and likeness, but also their identity more broadly.

22. California's common law right of publicity may be enforced through an action for damages and/or injunctive relief.

23. As explained below, Defendant disregarded its legal responsibilities to Plaintiff Medina and many other real estate agents by using their names, identities, and other personally identifying information to advertise and promote its services, without any of their consent—in direct violation of the protections afforded by California's common law right of publicity.

## FACTUAL BACKGROUND

24. As the operator of "one of the top two networks homebuyers and sellers visit," Defendant has built a lucrative business centered around selling advertising and marketing packages to real estate agents and brokerages.[1]

25. Defendant has compiled a vast database of the names and personally identifying information of nearly all real estate agents in the United States.

26. Defendant uses the names, identities, and personal details of all real estate agents in its database to advertise its own products and services—even if those real estate agents have never provided Defendant consent to do so.

27. Defendant does this by publishing and disseminating hundreds of thousands of "profile pages" on the Website. Each profile page prominently

[1] CoStar, available at https://www.homes.com/solutions.

features the name, identity, and personally identifying details of one real estate agent and uses those names, identities, and personal details to advertise Defendant's own products and services.

28. Defendant has published and disseminated such profile pages for nearly all real estate agents in California.

**I. Defendant's Products and Services**

29. Defendant operates a classic "two-sided platform" business model through the Website.[2]

30. As Defendant's parent company, CoStar Group, Inc.[3], explains in its 2025 Form 10-K Annual Report filed with the Securities and Exchange Commission ("SEC"): "Our residential marketplaces aggregate consumer demand

---

[2] *See, e.g.*, Sunil Gupta and Carl F. Mela, *Harvard Business Review,* "What Is a Free Customer Worth?" (Nov. 2008) ("Customers who pay little or nothing and are subsidized by another set of customers are essential to a vast array of businesses . . . According to one estimate, this business model accounts for a majority of the revenues of 60 of the world's 100 largest companies . . . The rationale for this approach, of course, is that by charging one set of customers little or nothing, the business will attract the critical mass of them required to draw in large numbers of another set of customers, and the income generated by the latter will handsomely exceed the cost of acquiring and serving the former.").

[3] Defendant is a wholly owned subsidiary and the primary operating entity in the United States of CoStar Group, Inc. *See* CoStar Group, Inc., Form 10-K at 4 (February 25, 2026), available at: https://investors.costargroup.com/static-files/b212597e-42d8-49d4-8a71-b277eb1cb1f7.

for homes that they can rent or buy and we sell marketing and leads to the agents, owners, landlords, and property management companies that need to reach those consumers with their offerings."[4]

31. Defendant's SEC filings acknowledge that Homes.com is one its "flagship brands" hosting a "residential marketplace" in the United States. As Defendant states: "Homes.com allows property owners and real estate agents to reach renters and buyers on a your-listing your lead basis."[5]

32. Users of the Website's "residential marketplace" provide Defendant a wide audience which it leverages to sell marketing and advertising services to real estate agents, brokerages, home sellers, and home builders.

33. Registered users of the Website's Homes.com "residential marketplace" (e.g., membership account holders) are also immensely valuable to Defendant. Registered users enhance Defendant's ability to conduct digital advertising "retargeting" campaigns, which is a service that Defendant sells to paying customers on the second "side" of its "two-sided platform." Retargeting is a form of digital advertising where a website owner serves advertisements to internet users who visited their website but did not take a pre-defined action on the website,

[4] *Id*. at 11.

[5] *Id*.

which marketers commonly refer to as a "conversion." In a retargeting campaign, the website owner places ads in front of that same internet user on properties across the internet, including properties not owned by the website owner. When internet users make an account on an internet property owned by a website operator conducting a retargeting campaign, it makes the retargeting campaign significantly more effective, including by: (1) enabling cross-device tracking where the retargeter can track the internet user across devices (e.g., mobile devices, laptops, desktops) when they are signed into the account; (2) providing the retargeter with first-party data such as phone numbers and email addresses for the internet users, which can be used to build custom match audiences; (3) facilitating greater personalization of ads, because the retargeter can place ads for specific products (or properties) that an internet user left in their "cart" (or properties they have "favorited") on a website where they are logged into an account; (4) providing longer retargeting periods because traditional third-party cookies disappear after a certain about of time, whereas first-party account data is far more durable.

34. Defendant could not operate the "two-sided platform" through which it sells advertising and marketing services to real estate agents, brokerages, home sellers, and home builders without the users and registered users of its Homes.com "residential marketplace" which is hosted on the Website and its mobile app.

35. The products and services offered by Defendant through each "side" of this "two-sided platform" business model are described in more detail below.

36. *First*, Defendant offers several products and services to consumers for free on the first "side" of its "two-sided platform" business model.

37. Defendant's Homes.com "residential marketplace" is a prominent product and service it offers to potential homebuyers and sellers on the first "side" of its "two-sided platform." This "residential marketplace" is an online platform of real estate listings hosted on the Website. Using this platform, potential home buyers can search for properties and home sellers can list properties.[6]

38. Defendant hosts "millions" of real estate listings on the Homes.com "residential marketplace" through the Website.[7]

39. Defendant boasts an audience of 83 million people searching for homes per month within the Homes.com "residential marketplace."[8]

40. Defendant's "residential marketplace" permits internet users to search for properties for sale or list their own property for sale. Like other similar

[6] CoStar, "About the Homes.com Network", available at https://www.homes.com/about/.

[7] *Id.*

[8] CoStar, "Solutions", available at https://www.homes.com/solutions.

platforms, internet user can search by neighborhood and refine their search according to specific parameters (e.g., number of bedrooms, square footage, etc.).

41. A screenshot depicting the Homes.com "residential marketplace" as it appears on the Website after a search for properties in Catskill, New York is reproduced below:




42. Defendant offers free memberships to its Homes.com "residential marketplace" platform. These memberships permit internet users to make an account on the Website. To make a Homes.com account, internet users must provide Defendant with their email address, first name, and last name.

43. By making a Homes.com account, internet users can access features of the "residency marketplace" which are not available to users who do not have an account. Defendant's descriptions of some of these membership-exclusive features, are pictured in the screenshot below, which is taken from the Website[9]:




[9] CoStar, "Homes.com", available at https://www.homes.com/.

44. As shown above, registering for a membership and creating an account on the Website permits internet users to:

- "**Favorite properties** so you don't miss updates";
- "**Save searches** to stay updated on new homes"; and
- "**See what your home is worth** with our home valuation tool[.]"

45. Registering for a membership and creating a Homes.com account on the Website also permits internet users to access additional, member-exclusive features, like adding a "Note" to a property listing, creating a "Valuation Report", and unlocking the "Claim Your Home" feature.

46. Defendant's Homes.com "residential marketplace" is also accessible through Defendant's mobile application for smartphones.

47. A Homes.com membership account is required to access the member-exclusive features described above on both Defendant's Website and its corresponding Homes.com mobile application.

48. Defendant's "residential marketplace" hosted on the Website and mobile application is both a product and service offered by Defendant to potential home buyers and sellers on the first "side" of its "two-sided platform."

49. A membership to Defendant's "residential marketplace" (e.g., a Homes.com account) is both a product and service offered by Defendant to potential home buyers and sellers on the first "side" of its "two-sided platform."

50. The features available to the members of Defendant's "residential marketplace" (including the ability to "Favorite properties", to "Save searches" and to "See what your home is worth") are products and services offered by Defendant to potential home buyers and sellers on the first "side" of its "two-sided platform."

51. Defendant uses these products and services to induce individuals to become members of its "residential marketplace" and to register for accounts on the Website. Defendant does this to build an audience to support the advertising and marketing services that it offers on the second "side" of its "two-sided platform."

52. As Defendant states in its 2025 Form 10-K Annual Report, Defendant's "ability to attract and retain advertisers, and ultimately to generate advertising revenue, depends on a number of factors, including:" "Increasing the number of unique visitors to, and users of, our websites and mobile applications"; "The quantity and quality of the leads that we provide to our advertisers"; "The success of any marketing and product development efforts directed at attracting additional users and advertisers to our marketplaces."[10]

53. Defendant dedicates substantial resources to increasing the number of visitors and registered users of its "residential marketplace" hosted on the Website.

[10] CoStar Group, Inc., Form 10-K at 21 (February 25, 2026), available at: https://investors.costargroup.com/static-files/b212597e-42d8-49d4-8a71-b277eb1cb1f7.

As Defendant states: "We continue to invest significantly in sales and marketing as we seek to grow the numbers of users of, subscribers to and advertisers on, our marketplaces."[11]

54. Defendant directly attributes growth in its membership service to increases in its revenue. For example, it states: "We expect Residential Real Estate's revenue growth rate for the year ending December 31, 2026 to accelerate compared to the revenue growth rate for the year ended December 31, 2025, due to a full year's benefit of the Domain Acquisition completed in August 2025 and an increase in the number of Homes.com members."

55. *Second*, Defendant sells advertising and marketing services to paying customers (e.g. real estate agents, brokerages, home sellers, and home builders) on the second "side" of its "two-sided platform" business model that it operates through the Website and its mobile app.[12]

56. Defendant's ability to sell these advertising and marketing services depends upon the user base of the Homes.com "residential marketplace" and the registered users of Homes.com—both of which Defendant obtains through the products and services it offers on the first "side" of its "two-sided platform."

---

[11] *Id*. at 20.

[12] CoStar, "Homes.com Digital Marketing Solutions", available at https://www.homes.com/advertise/agents/.

57. Defendant targets its paid services towards three groups on the "Advertising" page of the Website: (1) real estate agents, (2) home sellers, and (3) builders.[13]

58. For real estate agents, Defendant sells "Digital Marketing Solutions."[14]

59. Real estate agents can purchase a one-year subscription to these Digital Marketing Solutions. Such a subscription places the agent's listings on the "residential marketplace" at the top of search results, and above the listings posted to the "residential marketplace" by non-subscribing agents. Subscribing real estate agents receive "priority placement on neighborhood, school and condo building page." Further, Subscribers get access to 3D tour and floorplan technologies which appear in their listings on the "residential marketplace."[15]

60. Subscriptions also permit real estate agents to enable retargeting advertising campaigns for property listings they post on the Homes.com "residential marketplace." Defendant prominently advertises these retargeting campaigns as

---

[13] CoStar, "Advertise Your Real Estate Listing," available at https://www.homes.com/advertise/.

[14] CoStar, "Homes.com for Agents," available at: https://www.homes.com/advertise/agents/.

[15] *Id.*

one of the main value-ads of a paid Homes.com membership for real estate agents, as shown in the screenshot below from the Website[16]:




[16] *Id.*

61. Defendant publishes videos touting the retargeting capabilities of its digital advertising and marketing services and its executives frequently cite those capabilities as a principal reason why its customers pay for its services.[17]

62. The average annual subscription cost of a Homes.com for real estate agents is $3,400.[18]

63. Real estate agents can also purchase Defendant's *a la carte* "Listing Boost" service, which is a "digital marketing package designed to help you sell your home faster and for more, offered as a one-time payment for a single property. It is our more flexible solution and the benefits apply until the listing is sold."[19]

---

[17] *See, e.g.*, Homes.com, *Homes.com Supports Agents Listings through Retargeting*, available at: https://www.youtube.com/watch?v=t1NLD4vZAic; HousingWire, *Homes.com outlines digital branding strategies agents need to win in a rebounding market* (Jan. 20, 2026), available at: https://www.housingwire.com/articles/homes-com-outlines-digital-branding-strategies-agents-need-to-win-in-a-rebounding-market/.

[18] Taylor Anderson, *Homes.com fees for new members will rise starting Friday: CoStar CEO*, Inman (April 29, 2026), available at: https://www.inman.com/2026/04/29/homes-com-fees-for-new-members-will-rise-starting-friday-costar-ceo/.

[19] CoStar, "Homes.com Digital Marketing Solutions", available at https://www.homes.com/advertise/agents/.

64. Defendant's promotional materials for its "Listing Boost" service also emphasize the retargeting aspect of that service, as shown in the screenshot below taken from Defendant's Website page on the "Listing Boost" service[20]:




65. For home sellers, including homeowners who do not have a listing agent, Defendant similarly promotes the "Listing Boost" service as a "one-time payment for a single property." Buying a "Boost" for a property means that a listing

[20] CoStar, "Homes.com Boost – Sell You Home Faster", available at: https://www.homes.com/advertise/boost/.

will "Sort higher in search results and reach more buyers" on the "residential marketplace" hosted on the Website, and that it will benefit from Defendant's retargeting digital advertising capabilities.[21]

66. For home builders, Defendant sells a feature called "Community Boost." Like the "Boost" service, a "Community Boost" brings listings "to the top of search results" on the "residential marketplace" hosted on the Website.[22]

67. As with Defendant's other customer bases, Defendant emphasizes its retargeting capabilities in its promotional materials concerning its Community Boost product, mention retargeting at least seven different times on page on the Website which is dedicated to promoting Community Boost. [23]

68. This "two-sided platform" business model has proven immensely lucrative for Defendant. For the fiscal year ended on December 31, 2025, CoStar Group, Inc. reported $3.247 billion in annual revenue.[24]

---

[21] CoStar, "Homes.com Boost," available at: https://www.homes.com/advertise/boost/.

[22] CoStar, "List Your New Home Community on Homes.com", available at: https://www.homes.com/advertise/community/.

[23] *Id.*

[24] CoStar Group, Inc., Form 10-K "Annual Report", available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001057352/000105735226000020/csgp-20251231.htm.

## II. Defendant Uses Plaintiff Medina's and the Putative Class Members' Names and Identities to Advertise Its Own Products and Services.

69. Defendant has created, published, and disseminated hundreds of thousands of profile pages on the Website, each of which uses a different real estate agents' name, identity, and personally identifying information to advertise Defendant's own products and services.

70. Defendant has neither requested nor obtained consent from many of the real estate agent whose names, identities, and other personal details it misappropriates on these profile pages prior to publishing and disseminating them.

71. Defendant disseminates these profile pages in California.

### A. Plaintiff Richard Medina's Profile Page

72. Plaintiff Richard Medina is a real estate agent in La Quinta, California.

73. The profile page created by Defendant regarding Plaintiff Richard Medina ("Plaintiff Medina's Profile Page") is representative of the hundreds of thousands of similar such pages published on the Website.[25]

74. Like the other profile pages created, published, and disseminated by Defendant, Plaintiff Medina's Profile Page uses his name, identity, and personally identifying information to advertise Defendant's products and services.

---

[25] CoStar, "Richard Medina | Real Estate Agent in Sherman Oaks, CA | XL Realty," available at https://www.homes.com/real-estate-agents/richard-medina/96t4mf5/.

75. Plaintiff Medina has never registered for Defendant's Website nor provided Defendant consent to use his name or identity in any manner, much less for the commercial purpose of advertising Defendant's products and services.

76. An excerpt of Plaintiff Medina's Profile Page is reproduced in the screenshot below[26]:




[26] *Id.*

77. Plaintiff's Medina's Profile Page prominently displays his name, phone number, work location, company, and sales statistics alongside buttons and links promoting and advertising Defendant's products and services.

78. Plaintiff's name is the most prominently-displayed text on the page—it appears in the largest font, in bold, and near the top of the page.

79. On the righthand side of the page, there is a box which displays Plaintiff's full name, company, and phone number. Underneath Plaintiff's phone number, there are two buttons, one which states "Send a Message", and another which states "Connect with Agent."

80. When an internet user clicks on the "Connect with Agent" button on Plaintiff Medina's Profile Page, the following "pop-up" appears:




81. As shown above, the "pop-up" displayed when an internet user clicks on the "Connect with Agent" button on Plaintiff Medina's Profile Page encourages the internet users to "Create an account of sign in to connect with an agent." It advertises that once a user creates a Homes.com account or signs into their Home.com membership, the user can then:

- "Receive shares from your agent";
- "Share properties, favorites, saved searches, notes and more with your agent"; and
- "Get notified about new properties in saved searches from your agent."

82. As shown above, the "pop-up" displayed when an internet user clicks on the "Connect with Agent" button on Plaintiff Medina's Profile Page also includes a button the internet user can click on to "Register" for a membership with Defendant's "residential marketplace."

83. When an internet user clicks on the "Register" button in the "pop-up" displayed above on Plaintiff Medina's Profile Page, the following "pop-up" is displayed on Plaintiff Medina's Profile Page:



84. As shown above, this "pop-up" encourages internet users to "Register" for a membership with Defendant's "residential marketplace" and advertises the following features which are available with a Homes.com membership:

- "**Favorite properties** so you don't miss updates";
- "**Save searches** to stay updated on new homes"; and
- "**See what your home is worth** with our home valuation tool[.]"

85. Other aspects of Plaintiff Medina's Profile Page are designed to funnel internet users into creating accounts on the Website and registering for Homes.com memberships. For example, when an internet user clicks on the heart-shaped icon at the top of the Plaintiff Medina's Profile Page, the same "pop-up" appears:




86. As shown and discussed above, this "pop-up" advertises Defendant's Homes.com memberships.

87. When an internet user clicks the icon with a square and an arrow (which is next to the heart-shaped icon), a "pop-up" appears with a button stating: "Invite a Co-Shopper." When the "Invite a Co-Shopper" button is click, the same "pop-up" as pictured immediately above advertising Homes.com memberships is displayed on Plaintiff Medina's Profile Page.

88. When an internet user clicks the "Send a Message" button on Plaintiff Medina's Profile Page, they are led to a form that claims to send the user's name,

email address, phone number, and message to Plaintiff Medina. However, Plaintiff does not have an account with Homes.com and therefore cannot access any "leads" supposedly generated through Plaintiff Medina's Profile Page (which Defendant created without Plaintiff's knowledge or consent). Consumers using the "Connect with Agent" or "Send a Message" buttons may therefore obtain the false impression that Plaintiff Medina has ignored their message or attempts to contact him, thereby damaging his professional reputation.

89. In the upper righthand corner of Plaintiff Medina' Profile Page, a link in bold orange test states: "Advertise." When clicked, that link leads users into Defendant's sales pipeline for its paid subscription and one-time advertising and marketing products, as pictured below[27]:

[27] CoStar, "Advertise Your Real Estate Listing – Homes.com, available at https://www.homes.com/advertise/.




90. Each of the links pictured in the screenshot above lead directly to one of the pages on the Website dedicated to promoting and advertising Defendant's paid marketing and digital advertising services.[28]

[28] *See, e.g.*, CoStar, "Homes.com for Agents – Membership and Listing Marketing", available at: https://www.homes.com/advertise/agents/; CoStar, "Homes.com Boost – Sell Your Home Faster", available at: https://www.homes.com/advertise/boost/; CoStar, "List Your New Home Community on Homes.com", available at: https://www.homes.com/advertise/community/.

91. Defendant's motive in publishing Plaintiff Medina's Profile Page and the hundreds of thousands of other profile pages is to use those respective real estate agents' names and identities to attract users to its Website, serve them the advertisements for its own products and services.

92. By advertising its own products and services on Plaintiff Medina's Profile Page (and each of the other profile pages it publishes), Defendant seeks to obtain both additional: (1) users of the Homes.com "residential marketplace"; and (2) registered members with Homes.com accounts.

93. Users of Defendant's Homes.com "residential marketplace" are valuable to Defendant because they are the audience for many of the digital marketing and advertising services and products that Defendant sells to its paying customers through the "two-sided platform" it operates on the Website. For example, Defendant's customers would not pay to place their property listings at the top of the search results on the "residential marketplace," or above the listings posted to the "residential marketplace" by non-subscribing agents, if there was not a wide audience of potential home buyers using the "residential marketplace" to search for homes available for sale.

94. Registered members with Homes.com accounts are valuable to Defendant because they facilitate Defendant's retargeting capabilities that it sells to its paying customers. For example, Defendant's customer's would not pay for its

retargeting capabilities if there were no registered account holders users whom Defendant could retarget across devices, through custom match audiences, according to specific properties they have "favorited", or over long term campaigns—all of which is made possible by Defendant having a large number of account holders using the "residential marketplace."

95. Defendant knows that consumers, sellers, and real estate professionals alike use Google and other internet search engines to search for individual real estate agents by name. Defendant's intent in publishing Plaintiff Medina's Profile Page and the hundreds of thousands of other profile pages is to capture internet traffic from internet users who are searching for these real estate agents by name, attract those internet users to the profile pages, and then advertise Defendant's own products and services to those internet users.

96. Defendant intentionally used Plaintiff Medina's and hundreds of thousands of other real estate agents' names and identities to advertise its own products and services in this manner.

97. Defendant never requested or obtained consent from Plaintiff Medina to use his name, identity, or personally identifying information to advertise its own products and services in the manner described herein.

### III. Defendant Uses Plaintiff Medina's and the Class Members' Names in Search Engine Optimization Techniques on the Profile Pages.

98. Defendant further intentionally uses Plaintiff Medina's name and the names of hundreds of thousands of other real estate agents in search engine optimization ("SEO") techniques built into the profile pages.

99. Defendant uses these names in SEO techniques in order to trade on the commercial value associated with the names. Defendant's goal is to attract internet users who are searching for these individuals' names to Defendants' advertisements for its own products and services which appear on the profile pages.

100. Specifically, Defendant uses the names in this manner to ensure that the profile pages rank highly in search engine results whenever someone searches for the corresponding real estate agent's name—and thereby to more effectively advertise Defendant's own products and services.

101. Defendant uses the real estate agents' names in following specific SEO techniques on each profile page:

- **Placing the real estate agent's name in the page's URL.** For example, Plaintiff Medina's name appears in the URL for Plaintiff Medina's Profile Page[29]:

[29] CoStar, "Richard Medina | Real Estate Agent in Sherman Oaks, CA | XL Realty," available at https://www.homes.com/real-estate-agents/richard-medina/96t4mf5/. .




- **Placing the real estate agent's name the page's title.** For example, Plaintiff Medina's name appears in the page title for Plaintiff Medina's Profile Page, which is entitled "Richard Medina | Real Estate Agent in Sherman Oaks, CA | XL Realty"[30]:




  This page title is reflected in the following line of Plaintiff Medina's Profile Page's html source code: `<title>Richard Medina | Real Estate Agent in Sherman Oaks, CA | XL Realty</title>`

- **Placing the real estate agent's full name on the page multiple times.** For example, Plaintiff Medina's name appears on Plaintiff's Medina's Profile Page nine separate times.

- **Placing the real estate agent's name in the page's headers.** For example, Plaintiff Medina's name appears in the first-level "header" on

---

[30] *Id.*

Plaintiff Medina's Profile Page.[31] This is reflected on the face of the page and in the following line of the page's source code: `<h1> <span class="name js-agent-name">Richard Medina</span></h1>`

- **Placing the real estate agent's name in the meta 'description' tag of the page's source code.** A 'description' meta tag is a piece of code placed on a website which structures search engines' understanding of the content on the page. Defendant's use of real estate agent' names in this technique ensures that search engines pick up the names when indexing pages and display the page in results generated in response to queries including the name.[32] The 'description' meta tag is reflected in the following line of the source code on Plaintiff Medina's Profile Page: `<meta name="description" content="Real Estate`

---

[31] *See* Amelia Willson, Search Engine Journal, *How To Use Header Tags: SEO Best Practices* (May 31, 2024), available at https://www.searchenginejournal.com/on-page-seo/header-tags/.

[32] *See, e.g.*, Google Search Central, "Meta Tags and Attributes that Google Supports," available at https://developers.google.com/search/docs/crawling-indexing/special-tags (explaining "meta tags are HTML tags used to provide additional information about a page to search engines and other clients.") (also stating with respect to the 'description' meta tag: "Use this tag to provide a short description of the page. In some situations, this description is used in the snippet shown in search results.").

`Agent Richard Medina of Sherman Oaks, CA. Read reviews, see agent listings, and contact for all your real estate needs." />`

- **Tagging images with the real estate agent's name using Alt text.** Alt text is a web development protocol which describes images for visually impaired users. Web developers can also enhance the search engine rankings of their pages by inserting keywords into the Alt text descriptions of images on websites.[33] Defendant tags placeholder images on each profile page with the corresponding real estate agent's name, work location, and practice area using Alt text. It does this even though the images on those unclaimed profile pages do *not* picture the individual whose name is contained in the Alt text. For example, one of the images of a house on Plaintiff Medina's Profile Page is described with the following Alt text: `alt=" Richard Medina listing agent for 20134 Leadwell St Unit 372, Winnetka, CA - sold for $410,000"`

[33] Holly Cardew, *pixc*, "Mastering Alt Text Best Practices: Elevating SEO for Your Online Store" (July 1, 2024), available at https://pixc.com/blog/alt-text-best-practices/.

- **Placing the real estate agent's name in Schema.org descriptors.** Including the real estate agents' names in Schema.org descriptors embedded in the pages' source code ensures that search engines recognize the names as names, and are able to calibrate search engine results accordingly.[34] The Schema.org descriptors are reflected in the following line of the source code on Plaintiff Medina's Profile Page: `{"@context":"https://schema.org","@graph":[{"@type":"ProfilePage","url":"https://www.homes.com/real-estate-agents/richard-medina/96t4mf5/","headline":"Richard Medina | Real Estate Agent in Sherman Oaks, CA | XL Realty"`
- **Placing multiple variants of the real estate agent's name on the page.** A website's use of common variants of a keyword phrase aids search engines in connecting different uses of that phrase to others (this is sometimes referred to as "keyword stemming" or "keyword phrase

[34] *See* Schema.org, *Getting started with schema.org using Microdata*, available at https://schema.org/docs/gs.html. Schema.org descriptors are used solely for the purpose of improving the search engine optimization of a webpage.

stemming").[35] For example, Plaintiff Medina's Profile Page uses two different various of his name: "Richard Medina" and "Richard."

102. Defendant's use of these SEO techniques reflects an intentional choice by Defendant to hold out Plaintiff Medina's name in search engines for the commercial purpose of trading on the value associated with his name.

103. Defendant's use of Plaintiff Medina's name in these SEO techniques is designed to attract internet users who are searching for his name to the advertisements published by Defendant for its own products and services on Plaintiff Medina's Profile Page.

104. Through each of these SEO techniques, Defendant intended to optimize the ranking of the profile pages in search engine results (e.g., in the results generated by a query on google.com) when any user searches for the name of any individual for whom Defendant has built a profile page.

[35] *See* Topic Ranker Blog, *Yes, SEO Keywords Can Be Phrases (12 Best Examples)* (Oct. 17, 2024) ("Don't limit yourself to exact match keywords. Search engines have evolved to understand the intent behind queries, so optimizing for related phrases and synonyms can help you capture a wider range of relevant traffic."); *see also id*. ("Weave your target keyword phrases naturally into important on-page elements such as page titles, headings (H1, H2, etc.), body copy, and meta descriptions.")

105. Defendant could have easily prevented the profile pages from appearing in search engine results by adding a "noindex" directive to the pages' source code.[36] Defendant chose not to.

106. Defendant itself acknowledges that "Digital and direct marketing, including SEM, SEO, paid advertising, social media, and display advertising, help us find prospective clients."[37]

107. Defendant specifically acknowledges using SEO techniques on the Website in its SEC filings.[38]

108. Defendant's Form 10-K Annual Report for 2025 includes a section on "Risks related to our business." One of the "risks" disclosed by Defendant reads: "If our websites are not prominently featured in internet search engine results, if internet search engines integrate technologies or adopt ranking methodologies that

[36] A "noindex" directive is a piece of code on the page that instructs search engines not to index the page. *See* Google Search Central, *Block Search indexing with noindex*, available at https://developers.google.com/search/docs/crawling-indexing/block-indexing.

[37] CoStar Group, Inc., Form 10-K at 12 (February 25, 2026), available at: https://investors.costargroup.com/static-files/b212597e-42d8-49d4-8a71-b277eb1cb1f7.

[38] *Id.*

decrease traffic to our websites, or we are unable to maintain or grow traffic to our marketplaces, our business and operating results could be adversely affected."[39]

109. Relatedly, Defendant's Form 10-K Annual Report for 2025 discloses a risk that "Our competitors' SEO and SEM efforts may result in webpages from their websites receiving higher rankings than the webpages from our websites."[40]

110. Defendant's Form 10-K Annual Report for 2025 further states: "If we experience a material reduction in the number of users directed to our websites through internet search engines or otherwise fail to maintain or increase traffic to our marketplaces, our ability to acquire additional subscribers or advertisers and deliver leads to and retain existing subscribers and advertisers could be adversely affected."[41]

111. Using the aforementioned SEO techniques on the hundreds of thousands of profile pages that Defendant has published without the consent of the individuals to whom they correspond provides Defendant with a massive catalogue of webpages through which to drive traffic to its Website and serve advertisements for its own products and services to internet users who are searching for information about specific real estate agents.

---

[39] *Id*. at 21.

[40] *Id*.

[41] *Id*.

112. During the time period relevant to this action, numerous non-subscribers to Defendant's services performed searches on Google and other search engines that yielded results including hyperlinks to Plaintiff Medina's Profile Page, along with summaries of the information available on the profile page in the search-engine results themselves (including Plaintiff's name and other personally identifying information).

113. During the time period relevant to this action, numerous non-subscribers to Defendant's services visited Plaintiff Medina's Profile Page by clicking on a link to such page in the results page of a search performed on Google or another search engine.

114. During the time period relevant to this action, numerous non-subscribers to Defendant's services bore witness to the Defendant's use of Plaintiff Medina's name on Plaintiff Medina's Profile Page to advertise Defendants' products and services.

115. Defendant tracks, *inter alia*, the number of times when (by date and time) and from where (by, *inter alia*, IP address) each of each profile pages is viewed by a non-subscriber, the location from which the visitor to the page originated (such as a Google search results page), and the total numbers of persons who have visited a particular profile page.

116. Defendant continues to improve the coding of the profile pages to maximize their visibility to the consuming public in the results yielded by searches on Google and other popular search engines, and employ persons (and work with contractors) who focus specifically on these efforts.

**CLASS ACTION ALLEGATIONS**

117. Plaintiff Medina's Profile Page is representative of the hundreds of thousands of profile pages disseminated by Defendant in California.

118. Pursuant to Federal Rule of Civil Procedure 23(b)(1), 23(b)(2), 23(b)(3), and where applicable, 23(c)(4), Plaintiff Medina brings this action, on behalf of himself and members of the "Class" defined as follows:

> All natural persons residing in the state of California for whom Defendant established a profile page on Homes.com and who have not created an account on Homes.com.

119. Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

120. Plaintiff Medina reserves the right to modify the definitions of the Class, including based on discovery and further investigation.

121. The members of the Class are so numerous that their individual joinder herein is impracticable. Plaintiff Medina is informed and believes, and thereupon alleges, that the members of the Class number easily into the tens of thousands. The precise number of members of the Class and their identities are unknown to Plaintiff at this time but will be readily determined in discovery, including by reference to Defendant's records. Members of the Class may be notified of the pendency of this action by email, mail and/or publication through the records of Defendant.

122. Plaintiff Medina's claims are typical of the claims of the members of the Class he seeks to represent in that Plaintiff and all members of the Class were injured and sustained damages by Defendant's uniform wrongful conduct—namely, Defendant's practices of using Plaintiff's and the Class members' names, identities, and personally identifying information on profile pages published on the Website to advertise, sell, and promote, and to solicit sales of its products and services, without any of their consent.

123. Common questions of law and fact exist as to all members of each of the Class and predominate over questions affecting only individual members. Legal and factual questions common to the Class include, but are not limited to:

a. Whether Defendant engaged in the alleged conduct;

b. Whether Defendant knowingly used the names and personally identifying information of the members of the Class;

c. Whether Defendant used the Class members' names, identities, and other personally identifying information for the purpose of advertising products or services;

d. Whether Defendant had the Class members' consent to use their names and personally identifying information in this way;

e. Whether members of the Class are entitled to recover statutory damages;

f. Whether members of the Class are entitled to equitable relief, including injunctive relief.

124. Plaintiff Medina is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other members of the Class he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the members of the Class will be fairly and adequately protected by Plaintiff Medina and his counsel.

125. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to

all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of such issues.

**<u>FIRST CLAIM FOR RELIEF</u>**

**Violation of the California Right of Publicity Law, Cal. Civ. Code § 3344(a)**
**(By Plaintiff Medina, Individually and On Behalf of the Class)**

126. Plaintiff Medina, individually and on behalf of the Class, repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

127. Defendant is a corporation and thus a juristic "person" within the meaning of the CRPL. *See* Cal. Civ. Code § 3344(a)(1).

128. During the time period relevant to this action, Defendant publicly used the name, identity, and personally identifying attributes of Plaintiff and the Class members in the manner alleged herein, including by using such names, identities, other personally identifying information on profile pages to advertise Defendant's own products and services.

129. Defendant's products and services that it used Plaintiff's and the Class members' names and identities to advertise include its Homes.com "residential marketplace", memberships and accounts to its Homes.com "residential marketplace", and the features available to members and registered users of its Homes.com "residential marketplace", as well as Defendant's advertising and marketing services which it makes available for sale to real estate agents, brokerages, home sellers, and home builders.

130. Defendant's use of Plaintiff's and the Class members' names, identities, and personally identifying information on profile pages constitutes a "use" "for purposes of "advertising" "products, merchandise, goods, or services" within the meaning of the CRPL. *See* Cal. Civ. Code § 3344(a)(1).

131. Defendant's Homes.com "residential marketplace" hosted on the Website constitutes "products, merchandise, goods, or services" within the meaning of the CRPL. *See id*.

132. Defendant's memberships and accounts to its Homes.com "residential marketplace" hosted on the Website constitute "products, merchandise, goods, or services" within the meaning of the CRPL. *See id*.

133. The features available to members and registered users of Defendant's Homes.com "residential marketplace" (including the ability to "Favorite properties", to "Save searches" and to "See what your home is worth") on the

Website constitute "products, merchandise, goods, or services" within the meaning of the CRPL. *See id*.

134. Defendant's advertising and marketing services which it makes available for sale to real estate agents, brokerages, home sellers, and home builders constitute "products, merchandise, goods, or services" within the meaning of the CRPL. *See id*.

135. Defendant has published and disseminated the profile pages in California.

136. Prior to using and holding out Plaintiff's and the Class members' names and other personally identifying information for advertising purposes in the manner alleged herein, Defendant did not notify Plaintiff nor any member of the Class that it would do so, and neither Plaintiff nor any member of the Class has ever consented (in writing or otherwise) to Defendant doing so.

137. By using Plaintiff's and the Class members' names, identities, and other personally identifying information to advertise its products and services, without their prior consent, Defendant infringed upon Plaintiff's and the Class members' rights of publicity in violation of the CRPL.

138. Plaintiff suffered mental anguish as a result of Defendant's unauthorized uses of his name, identity, and other personally identifying information in the manner alleged herein. Upon learning that his name, identity,

and other personal details were being used by Defendant to sell its products and services on the open market for its own financial gain without his consent, Plaintiff became worried, frustrated, and concerned about his inability to control the use of her identity, disturbing his peace of mind in a meaningful way—just as would occur to any reasonable person (including members of the Class) under the same or similar circumstances. Plaintiff's loss of control of his name and identity for commercial purposes is highly distressing to him and causes him concern about how Defendant currently uses, has used in the past, and may use his name and identity to advertise its services in the future.

139. Significant commercial value exists in the aspects of Plaintiff's and the other Class members' names and identities that Defendant used and continues to use in the manner alleged herein.

140. Defendant's use of Plaintiff's and the Class members' names, identities, and other personally identifying information in profile pages was not incidental. On the contrary, it was instrumental (and continues to be instrumental) to Defendant in obtaining users of its platform. This is demonstrated by the sheer volume of profile pages published by Defendant on the Website.

141. Defendant does not use Plaintiff Medina's nor the Class members' names to identify nor describe Defendant's own products or services. Neither Plaintiff nor any member of the Class has ever registered for Defendant's Website,

meaning that they are not a part of Defendant's real estate agent network. Nor is information about Plaintiff nor any member of the Class available for sale on Defendant's website.

142. On behalf of himself and the Class, Plaintiff seeks: (1) an injunction requiring Defendant to obtain prior consent from the Cass members prior to the use of their names and identities to advertise products or services; (2) $750.00 in statutory liquidated damages to Plaintiff and each Class member; (3) punitive damages in an amount to be determined at trial; and (4) costs and reasonable attorneys' fees. *See* Cal. Civ. Code § 3344(a)(1).

## <u>SECOND CLAIM FOR RELIEF</u>
### Violation of California's Common Law Right of Publicity
### (By Plaintiff Medina, Individually and On Behalf of the Class)

143. Plaintiff Medina, individually and on behalf of the Class, repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

144. Defendant used Plaintiff Medina's and the Class member's names, identities, and other personally identifying details on profile pages advertising and promoting Defendant's own products and services.

145. Defendant misappropriated Plaintiff Medina and the Class member's names, identities, and other personally identifying details on those profile pages to its own commercial advantage by using them to advertise its own products and services, including its "residential marketplace" hosted on the Website,

memberships and accounts to its "residential marketplace", the features available to members and registered users of its "residential marketplace", and its advertising and marketing services available for sale to real estate agents, brokerages, home sellers, and home builders.

146. Prior to using and appropriating Plaintiff's and the Class members' names, identities, and other personally identifying information for advertising purposes in the manner alleged herein, Defendant did not notify Plaintiff nor any member of the Class that it would do so, and neither Plaintiff nor any member of the Class ever consented (in writing or otherwise) to Defendant doing so.

147. Defendant's use and appropriation of Plaintiffs' and the Class members' names and identities on the profile pages without their consent to advertise Defendant's own products and services injured Plaintiff and the Class members by depriving them of the commercial value associated with the use of their names and identities for advertising purposes.

148. Defendant's use and appropriation of Plaintiffs' and the Class members' names and identities on the profile pages without their consent to advertise Defendant's own products and services further injured Plaintiff and the Class members by causing them mental anguish, including worry, frustration, and concern in a meaningful way.

149. Defendant has published and disseminated the profile pages in California.

150. By using Plaintiff's and the Class members' names, identities, and other personally identifying information to advertise its products and services, without their prior consent, Defendant infringed upon Plaintiff's and the Class members' California common law rights of publicity.

151. Significant commercial value exists in the aspects of Plaintiff's and the other Class members' names and identities that Defendant used and continues to use in the manner alleged herein.

152. Defendant's use of Plaintiff's and the Class members' names, identities, and other personally identifying information in profile pages was not incidental. On the contrary, it was instrumental (and continues to be instrumental) to Defendant in obtaining users of its platform. This is demonstrated by the sheer volume of profile pages published by Defendant on the Website.

153. Defendant does not use Plaintiff Medina's nor the Class members' names to identify or describe Defendant's own products or services. Neither Plaintiff nor any member of the Class has ever registered for Defendant's Website, meaning that they are not a part of Defendant's Homes.com Network. Nor is any information about Plaintiff nor any member of the Class available for sale on Defendant's website.

154. On behalf of himself and the Class, Plaintiff seeks an injunction requiring Defendant to obtain prior consent from the Cass members prior to the use of their names and identities to advertise products or services.

**THIRD CLAIM FOR RELIEF**

**Violation of California's Unfair Competition Law, Cal. Bus. & Prof. §§ 17200**

**(By Plaintiff Medina, Individually and On Behalf of the Class)**

155. Plaintiff Medina, individually and on behalf of the Class, repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

156. California Business and Professions Code section 17200 et seq. ("UCL") prohibits "unlawful, unfair, or fraudulent business acts or practices."

157. By selling misappropriating Plaintiff's and the Class members' names and identities without consent, as described above, Defendant has engaged in unlawful and unfair acts and practices prohibited by the UCL.

158. Defendant's conduct is unlawful under the UCL because it violates California's common-law and statutory right of publicity, as discussed in the first and second causes of action.

159. Defendant knowingly used and continues to use the names, identities, and other identifying information of the class members for the purpose of advertising its products and services.

160. Defendant's misappropriation of Plaintiffs and the Class members' names, identities, and other identifying information was to the company's economic and commercial advantage.

161. Defendant has generated millions of dollars of revenue from subscriptions to its marketing and advertising products, which would be worthless without the users and registered users of the Homes.com platform, which Defendant obtains in significant part through advertising which uses Plaintiff's and the Class members' names and identities on profile pages published on the Website.

162. At no time has Defendant affirmatively sought consent from Plaintiff or the Class members before misappropriating their names, identities, and personally identifying information for commercial purposes.

163. Neither Plaintiff nor the Class members received any compensation for Defendant's commercial use of their names, identities, and other personal identifying information.

164. Defendant's conduct also constitutes unfair business practices under the UCL because these practices offend established public policy and cause harm to the Plaintiff and the Class members, which cannot be reasonably avoided, and that outweighs any benefit to consumers or competition. The conduct also is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

165. Plaintiff and the Class members have suffered economic injury as a result of Defendant's unlawful and unfair business practices. But for its violation of law, Defendant would have either paid Plaintiff and the Class members for consent to use their names, identities, and other personally identifying information, or ceased its commercial use of those attributes.

166. As a result of its unlawful and unfair business practices Defendant has reaped and continues to reap unfair and illegal profits at the expense of the plaintiffs and class members. Thus, Defendant should be required to disgorge its illegal profits, and to pay the plaintiffs and class members restitution in an amount according to proof at the time of trial.

167. Plaintiffs Medina's and the Class members' names, identities, and other personally identifying information is likely to remain in use by Defendant for the commercial purpose of advertising its own products and services, without their consent, and without compensation from Defendant without an injunction to prohibit that unlawful conduct.

## FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(By Plaintiff Medina, Individually and On Behalf of the Class)**

168. Plaintiff repeats and incorporates by reference each preceding paragraph as if fully stated herein.

169. Defendant has wrongfully and unlawfully used Plaintiff's and the Class members' names, identities, and other personal identifying information for the commercial purpose of advertising its own products and services without their consent for substantial profits.

170. Plaintiff's and the Class members' names, identities, and personal information have conferred an economic benefit on Defendant.

171. Defendant has been unjustly enriched at the expense of Plaintiff and the Class members, and the company has unjustly retained the benefits of its unlawful and wrongful conduct.

172. It would be inequitable and unjust for Defendant to be permitted to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

173. Plaintiff and the Class members accordingly are entitled to equitable relief including restitution and disgorgement of all revenues, earnings, and profits that Defendant obtained as a result of its unlawful and wrongful conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of the members of the Class, as follows:

A. For an order certifying the Class pursuant to Federal Rule of Civil Procedure 23 and naming Plaintiff Medina as representatives of the Class and Plaintiff's undersigned attorneys as counsel to represent the Class;

B. For an order entering judgment in favor of Plaintiff and the members of the Class on all claims for relief stated herein;

C. For an order awarding Plaintiff and the members of the Class actual damages, compensatory damages, punitive damages, statutory damages, and statutory penalties, in the amounts set by statute or to be proven at trial;

D. For an order for appropriate injunctive relief;

E. For an order awarding pre- and post-judgment interest according to law; and

F. For an award of attorneys' fees, costs and expenses to Plaintiff's counsel.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and members of the Class, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all claims and issues so triable.

Dated: September 22, 2026

Respectfully submitted,

By: /s/ *Frank S. Hedin*

**HEDIN LLP**
FRANK S. HEDIN
1395 Brickell Ave, Suite 610
Miami, Florida 33131
Telephone: (305) 357-2107
E-Mail: fhedin@hedinllp.com

*Counsel for Plaintiff and the Putative Classes*